IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

THERESA A. WOLFE,

    Plaintiff,

vs.

METROPOLITAN LIFE INSURANCE
COMPANY and LERNER NEW YORK,
INC.,

    Defendants.

Case No. 13-cv-159-JPG-DGW

**MEMORANDUM AND ORDER**

This matter comes before the Court on (1) plaintiff Theresa A. Wolfe's motion for summary judgment (Doc. 22) to which defendants Metropolitan Life Insurance Company ("MetLife") and Lerner New York, Inc. ("Lerner") (collectively "Defendants") have filed a response (Doc. 33); and (2) Defendants' motion for summary judgment (Doc. 24) to which Wolfe has filed a response (Doc. 32).  For the following reasons, the Court denies Wolfe's motion for summary judgment and grants Defendants' motion for summary judgment.

1. Background

Wolfe was a sales manager for Lerner and participated in an employee welfare benefit plan ("Plan").  The Plan is funded by a group long term disability insurance policy issued by MetLife to Lerner and confers discretionary authority on MetLife to determine eligibility for benefits.

    Disability, for purposes of the Plan

    means that, due to sickness, pregnancy or accidental injury, you are receiving
    Appropriate Care and Treatment from a Doctor on a continuing basis in order to
    maximize your medical improvement and you are unable to earn more than 80%
    of your Predisability Earnings from any employer in your Local Economy at any

> gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability Earnings.

Doc. 20-2, p. 9.  With respect to claims due to "mental or nervous disorders or diseases" the Plan provided that

> Monthly Benefits are limited to 12 months during your lifetime if you are Disabled due to a Mental or Nervous Disorder or Disease, unless the Disability results from: (1) schizophrenia; (2) bipolar disorder; (3) dementia; or (4) organic brain disease.  "Mental or Nervous Disorder or Disease" means a medical condition of sufficient severity to meet the diagnostic criteria established in the current Diagnostic and Statistic Manual of Mental Disorders.  You must be receiving Appropriate Care and Treatment for your condition by a mental health Doctor.

(Doc. 20-7, p. 73).  Once a claim for benefits is approved, the Plan requires insureds to provide "proof of continuing disability."

Wolfe stopped working on December 14, 2005, when she began to experience problems with her knee.  She filed a claim for disability benefits and was approved for those benefits on June 17, 2006.  The date of disability was designated as December 19, 2005.  Thereafter, Wolfe also applied for and received disability benefits from the Social Security Administration ("SSA").

She initially treated with Dr. Kyle Shepperson who diagnosed Wolfe with degenerative joint disease of the left knee and a Baker's cyst.  The Administrative Law Judge from the SSA found that Wolfe had the following severe impairments: degenerative joint disease, complex tear of the posterior horn of the medial meniscus, tricompartmental chondromalacia, internal derangement of the left knee, and depressive disorder.  At the SSA hearing, Karyn Perry, Ph.D. testified that Wolfe's depressive disorder was severe and would affect her ability to deal with the public.

In 2011, MetLife evaluated Wolfe's disability status and, as part of its review, solicited information from Wolfe's treating physicians. Dr. Robert Farmer, Wolfe's family physician, indicated Wolfe suffered from depression and pain. Under physical capabilities, he indicated Wolfe could sit, stand, and walk intermittently for two hours. He indicated Wolfe could not climb or twist/bend/stoop, but could reach above the shoulder level and operate a motor vehicle. She could lift up to fifty pounds "Occasionally, 1-35%," and 51 to over one hundred pounds "Never, 0%."

Previously, on the 2007 "Physical Capacity Evaluation Form, Dr. Farmer indicated Wolfe could "occasionally (1-33%)" lift up to twenty pounds from floor to waist, ten to twenty pounds from waist to shoulder, and less than ten pounds above shoulder. He indicated that Wolfe could "occasionally (1-33%)" carry twenty to twenty pounds, push twenty-one to fifty pounds, and pull ten to twenty pounds. Dr. Farmer further indicated Wolfe could "frequently (34-66%)" reach above shoulder level and reach front and side.

Dr. Wassila Amari, Wolfe's rheumatologist, also responded to a request from MetLife in 2011. Dr. Amari indicated Wolfe could "intermittently" sit for eight hours, stand for four hours, and walk for four hours. Dr. Amari indicated Wolfe could climb and twist/bend/stoop "occasionally, 1-33%, up to 2.5 hours;" reach above shoulder level "frequently, 34-88%, 2.5 – 5.5 hours;" and reach front and side at desk level, make fine finger movements, and make eye/hand movements "continuously, 67-100%, 5.5 – 8 hours." Dr. Amari indicated Wolfe could "frequently, 34-66%, 2.5 – 5.5 hours" lift up to twenty pounds, "occasionally, 1-33%, up to 2.5 hours" lift up to fifty pounds, and could "never, 0%" lift over fifty pounds. She indicated Wolfe could "frequently 34-66%, 2.5-5.5 hours, push/pull up to twenty pounds, "occasionally, 1-33%, up to 2.5 hours" push/pull twenty-one to fifty pounds, and "never, 0%" push/pull over fifty

pounds. Thereafter, based on the two doctors' differing evaluations, MetLife asked Dr. Amari whether she agreed with Dr. Farmer's stricter limitations, and Dr. Amari indicated she was in agreement with Dr. Farmer.

To further explore Wolfe's ability to work, MetLife obtained an "Employability Assessment" conducted by Karin Betz, a Certified Rehabilitation Counselor, on August 31, 2011. Doc. 20-2. Considering Wolfe's restrictions and limitations as set out by Dr. Farmer, that assessment indicated that Wolfe had the capacity to work as the manager of a retail store. It further concluded that Wolfe was qualified to perform the duties of retail store manager and such positions were available in her geographical area.

On October 4, 2011, Wolfe received a letter from MetLife indicating her benefits would be terminated because her medical evidence revealed she could return to gainful employment. Wolfe administratively appealed that decision. After Dr. Farmer found out MetLife terminated Wolfe's disability benefits, he wrote a letter clarifying that "the overall picture is that [Wolfe] has significant disability which causes her to be unable to be gainfully employed. She cannot stand or sit continuously for any duration more than perhaps 1-2 hours, even on a good day" (Doc. 20-1, p. 84).

On November 29, 2011, MetLife employed Dr. Neil McPhee for a further assessment of Wolfe's disability status. Considering Wolfe's medical records and limitations, Dr. McPhee opined that Wolfe's

> limitations would be as follows: lifting/carrying no more than 20 pounds occasionally and 10 pounds frequently, standing occasionally, walking occasionally, squatting and crawling rarely. Bending at the waist would be no more than frequently. There would be no restrictions to the use of her upper extremities. There would be no limitation to sitting with standard breaks and the ability to change positions for a few seconds for comfort as needed.

4

Doc. 20-1, p. 47.  Dr. McPhee contacted and expressed the aforementioned opinion to Dr. Farmer.  Dr. Farmer "agreed from a physical perspective," but "noted that psychological factors of depression and anxiety may be factors in her perceived pain and ability to work and be employable" (Doc. 20-1, p. 44).  Dr. McPhee attempted to contact Dr. Amari; however, he was unable to do so because Dr. Amari had moved from the area and failed to leave forwarding information.

On December 22, 2011, CorVel Corporation provided an "Employability and Labor Market Analysis" (Doc. 20-1, p. 20).  That analysis indicated Wolfe had the current functional ability to perform the following jobs: Supervisor, Order Takers; Supervisor, Customer Complaint Services; and Manager, Merchandise.  The analysis further indicated that reported salary ranges for potential positions "were in the range of Ms. Wolfe's commensurate wage level" (Doc. 20-1, p. 20).  The analysis concluded by stating, "The results of the transferable skills and labor market analyses support the vocational conclusion that vocational alternatives potentially exist in reasonable numbers in Ms. Wolfe's local economy" (Doc. 20-1, p. 20).

Based on the foregoing information, MetLife upheld its original determination to terminate Wolfe's benefits.  MetLife mailed a letter to Wolfe dated January 10, 2012, informing her of its decision and that she had "exhausted her administrative remedies under the Plan" (Doc. 20-1, p. 8).

On January 11, 2013, Wolfe filed her two-count complaint in the Circuit Court for the Third Judicial Circuit, Madison County, Illinois, asserting a claim for disability benefits under the Employee Retirement Income Security Act of 1974 ("ERISA").  Thereafter, Defendants removed the action to this Court.

Wolfe filed her motion for summary judgment alleging that Defendants' decision to terminate her disability benefits was arbitrary and capricious in that it was not founded upon evidence in the record. Defendants filed their motion for summary judgment. Defendants' motion seeks summary judgment on Count One of Wolfe's complaint against MetLife arguing that MetLife properly exercised its discretionary authority in terminating Wolfe's disability benefits. Defendants seek summary judgment on Count Two, Wolfe's claim against Lerner New York, arguing that Lerner New York had no discretion to make claims decisions or obligation to pay and is therefore an improper party. The Court will turn to consider the parties' motions for summary judgment.

2. Summary Judgment Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396. Where the moving party fails to meet its strict burden of proof, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e)(2); *Celotex*, 477 U.S. at 322-26;

*Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996).  A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252.

   3.  ERISA Standard

      As an initial matter, the Court will consider Lerner's argument that it is an improper defendant in this case and should be dismissed.  The instant ERISA claim "is 'essentially a contract remedy under the terms of the plan.'"  *Brooks v. Pactiv Corp.*, 729 F.3d 758, 764 (7th Cir. 2013) (quoting *Larson v. United Healthcare Ins. Co.*, 723 F.3d 905, 910-12 (7th Cir. 2013)).  "As such, 'a cause of action for 'benefits due' must be brought against the party having the obligation to pay' the benefits."  *Brooks*, 729 F.2d at 764.  Wolfe points to a portion of the policy under "Contributions" which states "Your Long Term Disability Benefits are paid for by your Employer" in arguing Lerner is a proper party.  While the insurance is paid for by the employer, this does not indicate who is to pay out on a claim for benefits.  Rather, MetLife issued the certificate of insurance and has the obligation to pay.   Doc. 20-7, p. 53.  As such, the Court grants Defendants' motion for summary judgment to the extent Defendants argue Lerner is an improper defendant and dismisses Lerner from this case.  The Court will review the remaining arguments only against MetLife.

      Federal courts review an "ERISA administrator's benefits determination *de novo* unless the plan grants the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Holmstrom v. Metropolitan Life Ins. Co.*, 615 F.3d 758, 766 (7th

Cir. 2010) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).  Where the plan grants the administrator discretionary authority, the court only inquires whether the administrator's decision was "arbitrary and capricious."  *Holmstrom*, 615 F.3d at 766 (quoting *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008)).  Here, Lerner granted MetLife discretionary authority.  As such, the Court will only inquire as to whether MetLife's decision to terminate Wolfe's benefits was arbitrary and capricious.  Under the arbitrary and capricious standard, the court upholds a plan administrator's denial of benefits as long as there is "rational support in the record" for the decision.  *Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir. 2004).  It is not the court's role to make judgment calls, rather the plan "administrator's decision will not be overturned unless it is 'downright unreasonable.'"  *Davis v. Unum Life Ins. Co. of America*, 444 F.3d 569, 576 (7th Cir. 2006).

      The arbitrary-and-capricious standard, however, is not merely "a rubber stamp," and the court "will not uphold a termination when there is an absence of reasoning in the record to support it."  *Holmstrom*, 615 F.3d at 766 (quoting *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 715 F.3d 771, 774-75 (7th Cir. 2003)).  The plan administrator must give specific reasons for a denial, communicate those reasons to the claimant, and afford the claimant a "full and fair review."  *Holmstrom*, 615 F.3d at 766 (citing *Tate v. Long Term Disability Plan for Salaried Employees of Champion Int'l Corp. No. 506*, 545 F.3d 555, 559 (7th Cir. 2008)).

      Among other considerations, the court must weigh an administrator's conflict of interest as "a key consideration."  *Holmstrom*, 615 F.3d at 766-67.  A conflict of interest arises "when the administrator has both the discretionary authority to determine eligibility for benefits and the obligation to pay benefits when due."  *Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 860-61 (7th Cir. 2009).  Here, MetLife has both the discretionary authority to

8

determine benefits and the obligation to pay. As such, the Court will weigh this conflict of interest in its decision.

Wolfe first argues that MetLife's decision to terminate her benefits was inconsistent with its prior evaluations of her condition. Specifically, Wolfe indicates there was no evidence in the record that her condition had improved since prior evaluations. However, there is nothing under ERISA that prohibits an administrator from reviewing a claimant's disability status and, "in appropriate cases, to change its mind." *Holmstrom*, 615 F.3d at 767. As such, the Court finds no merit in this argument.

Next, Wolfe contends that MetLife disregarded the evidence of Dr. Farmer's opinion. The Court simply cannot agree with that assessment from a review of the evidence. This does not appear to be a case where the insurer's consultant's contrary opinions were credited and the treating physicians' opinions were ignored. Rather, it appears MetLife considered both Drs. Farmer's and Amari's opinions in making its determination. Both treating physicians' reports are contained within the file. In fact, Dr. McPhee even consulted Dr. Farmer and attempted to consult Dr. Amari prior to issuing his 19-page report. Dr. Farmer ultimately agreed with Dr. McPhee's physical assessment and Dr. Farmer's assessments were included in the evaluation. Wolfe suggests that MetLife ignored indications of Wolfe's depressive disorder and failed to inquire further. However, the Plan specifically states Wolfe must receive treatment from a mental health doctor prior to receiving benefits based upon a mental disorder. There is no evidence that Wolfe treated with a mental health doctor. Dr. Farmer, a general practitioner, was Wolfe's only treating doctor that referenced Wolfe's limitations due to depression. As such, the Court finds this argument has no merit.

Next, Wolfe argues that it was improper for MetLife to fail to obtain an independent medical exam. As Wolfe herself points out, plan administrators are not required to secure independent medical evaluations. *See Wallace v. Reliance Standard Life Ins. Co.*, 318 F.3d 723, 724 (7th Cir. 2003). As the Seventh Circuit explained, insurers are not fiduciaries and thus are not required to advocate for their insureds by seeking out disabling conditions through independent medical examinations. *Id*. As such, MetLife's failure to seek out an independent medical examination alone does not serve as a basis for this Court to conclude MetLife's actions were arbitrary and capricious.

Related to the previous argument, Wolfe next contends that MetLife misconstrued or ignored Wolfe's medical records. First, Wolfe refers to the form Dr. Farmer completed arguing it did not allow him to provide specifics and was different than a previous form. Even if this form did not allow Dr. Farmer to provide specifics of Wolfe's condition, the evidence indicates that Dr. McPhee consulted Dr. Farmer and they agreed on Wolfe's physical limitations. Accordingly, Wolfe cannot claim MetLife misconstrued or ignored this evidence. Wolfe again points to Dr. Farmer's mention of her depressive disorder. Again, the Plan requires that Wolfe be treated by a mental health doctor to support a claim based on a depression. There is no evidence in the record that Wolfe was treated by a mental health doctor for her depression and MetLife was not required to obtain an independent examination to that extent. As such, the Court finds this argument to be without merit.

Finally, Wolfe argues that MetLife's decision to terminate Wolfe's disability benefits was not supported by substantial medical evidence. Specifically, Wolfe points to the SSA Administrative Law Judge's findings based upon the testimony of Karyn Perry, Ph.D. and Dr. Farmers' treatment of Wolfe regarding Wolfe's depression. However, as previously indicated,

10

nothing prohibits MetLife from reassessing and terminating an insured's benefits as long as the decision is not arbitrary and capricious.  Wolfe was required to treat with a mental health doctor and provide ongoing evidence to support her claim for disability benefits.  She did not treat with a mental health doctor.  Further, the testimony of Karyn Perry, Ph.D. from 2009 does not satisfy Wolfe's obligation to provide MetLife with ongoing evidence from a mental health provider to support her current claim for benefits based on depression.

Wolfe also contends that the vocational analyses were not based on substantial evidence. The last vocational analysis, dated August 31, 2011, is explicitly based on Dr. Farmer's restrictions.  *See* 20-2, p. 33.  Wolfe references a mystery "nurse assessment" as the source of this evaluation; however, the nurse assessment appears to simply be the notes logged by the nurse working for MetLife.  Explicitly considering Dr. Farmer's restrictions, the assessment concluded that employment was available for Wolfe in her geographic region.  The December 22, 2011, assessment came to similar conclusions and was explicitly based on Dr. Farmer's limitations.  *See* Doc. 20-1, p. 20.  There is nothing to suggest that these assessments were not based on substantial evidence.  Rather, the aforementioned evidence indicates they were based on the limitations provided by Wolfe's treating physician.  Accordingly, viewing the evidence in the light most favorable to MetLife, the Court denies Wolfe's motion for summary judgment.

Viewing the evidence in the light most favorable to Wolfe, the Court finds that MetLife's decision to terminate Wolfe's benefits was not arbitrary and capricious.  MetLife's decision was not downright unreasonable.  Rather, it was based upon her treating physician's conclusions and employability assessments based upon those conclusions.  Specifically, Dr. Farmer completed a form relaying his assessment of Wolfe's limitations.  Dr. McPhee made his assessment and Dr. Farmer concurred with respect to the physical assessment.  Thereafter, based on these

assessments, an assessment of Wolfe's employability was made which indicated Wolfe no longer met the Plan's definition of disability.  Accordingly, because there is rational support in the record for MetLife's decision to terminate Wolfe's benefits, the Court grants MetLife's motion for summary judgment.

4. Conclusion

For the foregoing reasons, the Court **DENIES** Wolfe's motion for summary judgment (Doc. 22), **GRANTS** Defendants' motion for summary judgment (Doc. 24), and **DIRECTS** the Clerk of Court to enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED:** March 31, 2014

s/ J. Phil Gilbert<br>
**J. PHIL GILBERT**<br>
**DISTRICT JUDGE**